UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| DR. JAMES JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:09-CV-090-C |
| | § | |
| ANGELO STATE UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF
PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56 AND 12(C) MOTIONS
FOR SUMMARY JUDGMENT AND/OR JUDGMENT ON THE PLEADINGS**

FRANK HILL              09632000
MICHAEL Y. KIM          24039960
CHRISTIE L. HOBBS       24059961

HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013
(817) 261-2222
(817) 861-4685 Facsimile
fhill@hillgilstrap.com
mkim@hillgilstrap.com
chobbs@hillgilstrap.com

ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ iii

I.      SUMMARY OF THE ARGUMENT ...............................................................1

        A.      Rule 12(c) Motion for Judgment on the Pleadings ...................................1

        B.      Motion for Summary Judgment .................................................................1

II.     STATEMENT OF FACTS ................................................................................2

        A.      Plaintiff Begins His Employment at ASU..................................................2

        B.      Plaintiff's Religious Speech ......................................................................3

        C.      McCamant Confronts Plaintiff about His Religious Speech......................5

        D.      November 10, 2006 Evaluation..................................................................9

        E.      Provost Coers' Involvement.....................................................................11

        F.      Plaintiff Applies for Department Head Position ......................................13

        G.      Plaintiff Treated Less Favorably .............................................................15

        H.      McCamant Revised the November 10, 2006 Evaluation ..........................16

        I.      Plaintiff is Reappointed, then Non-Reappointed......................................17

        J.      President Rallo Reviews the First Non-Reappointment Letter .................20

        K.      Roden Continues Harassment ..................................................................22

        L.      Roden Changes Evaluation Policy & February 2008 Evaluation .............23

        M.      Dean Blount's Involvement & Second Non-Reappointment Recommendation........25

        N.      Second Non-Reappointment Letter & President Rallo's Review .............27

III.    SUMMARY JUDGMENT EVIDENCE .........................................................30

IV.     ARGUMENT AND AUTHORITIES .............................................................30

        A.      Standards of Review.................................................................................30

1.   Rule 12(c) Motion ......................................................30

2.   Rule 56 Motion...........................................................31

B.   Plaintiff's pleadings articulate viable claims under the Texas Constitution. ............32

1.   Plaintiff named a proper party and stated a proper claim ...........................32

2.   Plaintiff has not sued for monetary relief under the Texas Constitution, and he only seeks equitable relief, which is permitted. ....................................33

C.   ASU is not entitled to summary judgment ...............................................33

1.   Plaintiff's Title VII claims are not barred by limitations. ...........................33

2.   Plaintiff's EEOC/TWC charge does not invalidate his discrimination and retaliation claims. ......................................................................34

3.   The statutory notice requirement does not bar Plaintiff's claims under Chapter 110 of the Texas Civil Practice and Remedies Code. ..................................34

4.   The evidence demonstrates a valid contract and a breach thereof ...........................36

5.   Plaintiff presents a prima facie case of discrimination and hostile work environment. ............................................................................37

6.   There is adequate evidence of causation for Jones' discrimination and retaliation claims. ......................................................................38

7.   Jones' Federal Declaratory Judgment Act claim is valid. ............................46

PRAYER .............................................................................................47

CERTIFICATE OF SERVICE............................................................................48

**TABLE OF AUTHORITIES**

**Cases**

*Barr v. City of Sinton,*
   295 S.W.3d 287 (Tex. 2009) ................................................................. 35

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................ 31

*Brennan v. Stewart,*
   834 F.2d 1248 (5th Cir. 1988) ............................................................. 33

*Casey Ent. Inc. v. Am. Hardware Mut. Ins. Co.,*
   655 F.2d 598 (5th Cir. 1981) ............................................................... 31

*Celestine v. Petroleos de Venezuella SA,*
   266 F.3d 343 (5th Cir. 2001) ............................................................... 34

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................ 32

*City of El Paso v. Heinrich,*
   284 S.W.3d 366 (Tex. 2009) ........................................................... 32, 33

*Edelman v. Jordan,*
   415 U.S. 651 (1974) ............................................................................ 33

*Ex parte Young,*
   209 U.S. 123 (1908) ............................................................................ 33

*Guidry v. Am. Public Life Ins. Co.,*
   512 F.3d 177 (5th Cir. 2007) ............................................................... 31

*Hebert Abstract Co. v. Touchstone Properties, Ltd.,*
   914 F.2d 74 (5th Cir. 1990) ................................................................. 30

*Henderson v. United States,*
   517 U.S. 654 (1996) ............................................................................ 33

*Huckabay v. Moore,*
   142 F.3d 233 (5th Cir. 1998) ............................................................... 34

*Hughes v. Tobacco Inst., Inc.,*
   278 F.3d 417 (5th Cir. 2001) ............................................................... 31

*Hutto v. Finley*,
    437 U.S. 678 (1978) ................................................................................................33

*Johnson v. Johnson*,
    385 F.3d 503 (5th Cir. 2004) ....................................................................................31

*Lapides v. Board of Regents of the University System of Georgia*,
    535 U.S. 613 (2002) ................................................................................................32

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ....................................................................................31

*Lowrey v. Texas A&M Univ. Sys.*,
    117 F.3d 242 (5th Cir. 1997) ....................................................................................31

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ................................................................................................37

*Murry v. American Standard, Inc.*,
    488 F.2d 529 (5th Cir. 1973) ....................................................................................47

*Myers v. Texas*,
    410 F.3d 236 (5th Cir. 2005) ....................................................................................32

*Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*,
    532 F.3d 398 (5th Cir. 2008) ................................................................................31, 32

*Neitzke v. Williams*,
    490 U.S. 319 (1989) ................................................................................................31

*Priester v. Lowndes County*,
    354 F.3d 414 (5th Cir. 2004) ....................................................................................31

*Public Affairs Assocs. v. Rickover*,
    369 U.S. 111 (1962) ................................................................................................47

*Quantum Chemical Corp. v. Toennies*,
    47 S.W.3d 473 (Tex. 2001) ......................................................................................38

*Rachid v. Jack in the Box*,
    376 F.3d 305 (5th Cir. 2004) ....................................................................................38

*Raytheon Co. v. Hernandez*,
    540 U.S. 33 (2003) ..................................................................................................38

*Republic of the Phil. V. Pimentel*,
    128 S.Ct. 2180 ........................................................................................................46

*Sherwin-Williams Co. v. Holmes City,*
   343 F.3d 383 (5th Cir. 2003) .................................................................................................47

*Thornbrough v. Columbus & Greenville R.R.Co.,*
   760 F.2d 633 (5th Cir. 1985) .................................................................................................32

*Wilton v. Seven Falls Co.,*
   515 U.S. 277 (1995) .............................................................................................................47

## Other Authorities

Tex. Civ. Prac. & Rem. Code § 110.006(a) ...............................................................................35

## Rules

Fed. R. Civ. P. 19(a)(2) .............................................................................................................46
Fed. R. Civ. P. 12(c) .................................................................................................................30
Fed. R. Civ. P. 56(c) .................................................................................................................31
Fed. R. Civ. P. 56(e) .................................................................................................................32
Fed. R. Civ. P. 57 .....................................................................................................................47

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| DR. JAMES JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:09-CV-090-C |
| | § | |
| ANGELO STATE UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF
PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56 AND 12(C) MOTIONS
FOR SUMMARY JUDGMENT AND/OR JUDGMENT ON THE PLEADINGS**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Dr. James Jones, Plaintiff in the above-styled and numbered cause ("Plaintiff"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7.1, 7.2, 56.4, and 56.5, files this, his Brief in Support of Plaintiff's Response to Defendant's Rule 56 and 12(c) Motions for Summary Judgment and/or Judgment on the Pleadings, and in support thereof would respectfully show the Court the following:

**I.
SUMMARY OF THE ARGUMENT**

A.      **Rule 12(c) Motion for Judgment on the Pleadings**

    (1)      Plaintiff may bring claims against Defendant under the Texas Constitution, and he is not limited to bringing state constitutional claims only against state officials in their official capacities.

    (2)      Plaintiff has not sued for monetary relief under the Texas Constitution, and he only seeks equitable relief, which is permitted.

B.      **Motion for Summary Judgment**

    (1)      Plaintiff timely filed his Title VII claims within the 90-day statute of limitations because he filed his original suit in the Northern District of Texas, San Angelo Division, within the requisite time period, and that suit tolled the limitations period, thus, making the

filing of the state court suit (which is this current suit that was removed and transferred by Defendant) timely.

(2)   All of Plaintiff's claims under Title VII and Chapter 21 of the Texas Labor Code (and the conduct giving rise to them) are covered by his EEOC/TWC Charge because the conduct is all interrelated and a continuous course of action by Defendant.

(3)   The notice requirement under the Texas Religious Freedom Restoration Act is not jurisdictional, and Plaintiff gave Defendant actual and timely notice of the claim.

(4)   There is evidence that Defendant breached its contracts and agreements with Plaintiff because Defendant failed to follow its own policies, procedures, guidelines, rules, and/or regulations, which are a part of Plaintiff's contracts and agreements.  Also, Plaintiff has suffered damage, as he was not afforded the opportunity to continue his employment (non-reappointed) because Defendant used Plaintiff's religion as a motivating factor in the non-reappointment.  Additionally, Defendant injured or damaged Plaintiff's future employability.

(5)   Plaintiff was replaced by someone who is not an evangelical Christian and who does not openly express or identify his religious beliefs and practices.  Also, Plaintiff was treated less favorably than other faculty members, who did not openly express or identify their religious beliefs and practices.

(6)   While Defendant may try to mask its non-reappointment of Plaintiff as based on "non-discriminatory" reasons, there is evidence that Plaintiff's religious speech was a motivating factor in his non-reappointment.

(7)   Plaintiff has properly asserted a claim under the Federal Declaratory Judgment Act, as there is a present, continuing harm or future harm in that Defendant interprets and applies its policies to improperly prevent religious speech.  Also, Plaintiff does not need to name a state official, and he seeks proper declarations.

## II.
## STATEMENT OF FACTS[1]

### A.   Plaintiff Begins His Employment at ASU

2.1   Plaintiff has taught at the university level since 1996.  Appx. 1048.  In the fall of 2005, Plaintiff began teaching at Angelo State University ("Defendant and/or "ASU"), which at that time was a part of the Texas State University System (the "State System").  Appx. 415, 486-495, 1048.  At the time of Plaintiff's hire, Plaintiff was one of four faculty members in the Computer Science Department.

---

[1] Citations herein to "Appx." are references to Plaintiff's Appendix filed in conjunction with Plaintiff's Response to Defendant's Rule 56 and 12(c) Motions for Summary Judgment and/or Judgment on the Pleadings, and citations herein to Defendant's Appendix are noted as "Defendant's Appx."  Also, documents bearing the bates label "ASU" were produced by Defendant in response to discovery requests propounded by Plaintiff in this litigation.

*Id*.  Plaintiff was selected unanimously by a selection committee, and Dr. Tim Roden was not selected. Appx. 622-624, 659-664.  Also, at that time, the Computer Science Department was under the College of Business, and the Dean of the College of Business was Mike Butler ("Butler").  Appx. 1048. Plaintiff's official position with ASU throughout his employment was that of a tenure-track faculty member within the Computer Science Department, with the title of Associate Professor.  *Id*.

2.2     As a member of the faculty, Plaintiff taught six different courses, developed two core courses and an elective, and assisted students applying to graduate school.  *Id*.  Plaintiff received overall positive faculty and student evaluations beginning with the first annual review in January 2006 until February 2008.  Appx. 1048.  Plaintiff also published 11 papers and/or articles within his first two years at ASU, and also made numerous presentations at international conferences.  Appx. 1048-1049. Additionally, Plaintiff actively served on several university committees, participated with three student organizations, and took students to computer programming and robotics competitions.  *Id*. at 1049. Overall, Plaintiff strived to make himself visibly active in a broad spectrum of many extracurricular events at ASU during his time there.  *Id*.

**B.     Plaintiff's Religious Speech**

2.3     Plaintiff is an active evangelical Christian, and his practice is and always has been to identify himself as a Christian, share his faith with others, and allow those around him to be aware of his religious beliefs and convictions.  Appx. 1049.   Plaintiff believed and still believes that Defendant's conduct to prohibit him from engaging in his religious practices violated his religious beliefs and convictions that define him as a Christian.  *Id*.  Throughout Plaintiff's employment with ASU, it was his custom to describe his professional, educational, and personal background to his new classes and students to aid his students in understanding his viewpoints.  *Id*.  Stated differently, Plaintiff did this to help his students understand his perspective in the event of subjective discussions during classroom lectures.  *Id*.  Plaintiff also did this as a service to his students, to help them gain a balanced perspective,

since they are frequently told that no intelligent person who is intellectually honest can be a serious Christian. *Id*.

2.4     While describing his personal background, Plaintiff would tell his classes about his family, personal hobbies, and Christian faith. Appx. 426-427, 1049. In reference to his faith, Plaintiff would merely state that being a Christian was his most defining quality as a person, and he would briefly state what it meant to him to be a Christian. *Id*. This brief introduction was important to Plaintiff in representing himself as a Christian. *Id*. Other than the brief introductory remarks that Plaintiff made at the very beginning of each semester, on the last day of class, it was his custom to end the semester with a few parting words of encouragement. Appx. 1049. Plaintiff would do this by writing the words "richest of fare" on the blackboard and then relate the origin of the words in Isaiah 55:2, which states, "why spend your money on what is not bread, and your labor on what does not satisfy. Listen, listen to me, and eat what is good, and your soul will delight in the richest of fare." *Id*. Plaintiff would then explain his interpretation of the verse, and would go on by wishing his students well in their lives and careers, pointing out that in spite of the difficulties that they may face, people will face tragedies in life, so it is important to make decisions which allow you to experience the best that life has to offer. *Id*. Aside from the first day introductions and the parting words on the last day of class, Plaintiff did not mention his religious faith in the classroom. *Id*.

2.5     Plaintiff did not engage in "heavy handed preaching." Appx. 1049. One minute of the first day of class and one minute on the last day of class giving mild declarations can hardly be characterized as "heavy handed" or "preaching." *Id*. Plaintiff also did not leave books on the desks of students. *Id*. On the last day of class, as a gesture of saying "goodbye" to students that Plaintiff may never see again, he offered the students the opportunity to take a book as a gift. *Id*. I Plaintiff placed the books on a table, or if a table was not available, on one desk (not occupied by a student, nor next to a student). *Id*. Plaintiff did this in such a manner that a student would have to explicitly get a book of their own accord. *Id*. Plaintiff made it very clear that it was completely optional for the students to take

a book and that taking a book would not win any favor with him, nor would declining a book lose any favor with him. Appx. 1049-1050. To make it easy for the students to decline a book, Plaintiff would point out the fact that he had fewer books than there were students, and that therefore, some students would be leaving without a book. Appx. 1050. McCamant never discussed the giving out of any books, because either he never knew about this, or it had already been decided to non-reappoint Plaintiff, and it was, therefore, a moot issue. *Id*. The first time Plaintiff gave out any books was in May 2007, and Plaintiff was originally non-reappointed in August 2007. *Id*.

**C.     McCamant Confronts Plaintiff about His Religious Speech**

2.6     At the beginning of Plaintiff's second academic year (2006-2007), Dr. Mark Motl ("Motl") was removed as the Interim Department Head, and he was replaced by Dr. Charles McCamant ("McCamant"), who became the Head of the Computer Science Department. Appx. 1050. On or about August 28, 2006, McCamant met with Plaintiff to discuss Plaintiff's religious comments. Appx. 12. It was at this time that McCamant confronted Plaintiff about "talking about religion in the classroom." Appx. 700, 706, , 1050. McCamant did not merely inform Plaintiff that his comments "may" violate university policy, but rather, McCamant informed Plaintiff that his religious comments to his classes were inappropriate and should cease immediately and that his comments <u>violated</u> the State System's Rules and Regulations. *Id*.

2.7     During this meeting, McCamant referenced Chapter V, Rule 4.71 of the State System's Rules and Regulations which states that "[t]he faculty member is entitled to freedom in the classroom in discussing the faculty member's subject but should be judicious in the use of controversial material in the classroom and should introduce such material only as it has clear relationship to the subject field." Appx. 1050. Plaintiff informed McCamant that he believed that he had a constitutional right to make the brief comments he made in class, and Plaintiff claimed that he was not doing anything wrong. *Id*. Plaintiff requested a written explanation from McCamant stating how the university regulations were violated and what the university was asking him to do about it. *Id*. Notes were taken of the meeting,

and in those notes, the following discussion is memorialized:

> Question to Jim:  I have heard that you have engaged in declarations concerning your religious beliefs in one o[r] more of your classes.  Is this true?
>
> Answer:
>
> I want to caution you that declarations of this nature are a violation of the TSUS Rules and Regulations.  Chapter V, 4.71. . . .
>
> Feels ~~views are~~ not extreme.  Says he accepts students as they are.

Appx. 60, 168; *see also* Appx. 12, 128, 130, 700.

2.8     McCamant did not conclude the meeting on August 28, 2006 about Plaintiff's religious speech with a simple statement that he should "stick to the subject."  Appx. 1050.  McCamant was very adamant that Plaintiff was in violation of the policy, and he was very firm that Plaintiff's comments should cease immediately.  *Id.*  Additionally, it is not true that McCamant did not counsel Plaintiff further after the August 2006 meeting, as this issue consumed their interactions for the next several months.  Appx. 133, 428, 1050.  In fact, the discussions continued, and on or about August 30, 2006, Plaintiff made McCamant aware of his desire for a reasonable accommodation by asking McCamant for a written clarification of the alleged violation of university rules and what McCamant would like for him to do differently, while allowing him to exercise his first amendment rights.  Appx. 1050-1051.

2.9     Plaintiff expressed an eagerness to cooperate with the university on this issue, but not at the expense of sacrificing his constitutional rights.  Appx. 1051.  Plaintiff also expressed an eagerness to clear up any misunderstandings that may have arisen from this.  *Id.*  At almost every encounter, McCamant took the opportunity to remind Plaintiff that he was in violation of the policy, and Plaintiff would politely disagree with him.  Appx. 1050.  Plaintiff advised McCamant of his continued desire to make his limited religious comments.  Appx. 1051.  In response, McCamant informed Plaintiff that he had relayed Plaintiff's statements to ASU's Provost, Dr. Donald Coers ("Provost Coers"),[2] and that

---

[2] Dr. Donald Coers was the Provost of ASU, and as such, Provost Coers was the Chief Academic Officer to whom all of the deans reported, and he "had charge of student affairs and all the duties thereunto appertaining responsible for

Provost Coers had informed him that he would discuss this with the State System's attorney and get back in touch. *Id*. From approximately August 28, 2006 through March 2007, Plaintiff repeatedly requested clarification of the policies for which he was in violation as a result of his religious statements; however, Plaintiff was denied any clarification. Appx. 1050.

    2.10    On or about August 28, 2006, the same day as their meeting about Plaintiff's religious speech, McCamant sent Plaintiff an e-mail in which he merely directed Plaintiff to Rule 4.71 of Texas State University System Rules and Regulations.[3] Appx. 52. In response to McCamant's August 28th e-mail, on or about August 30, 2006, Plaintiff e-mailed McCamant and stated, "It was just today that I saw your email regarding the policy on content of speech in the classroom. Can you clarify in writing what it is that you think I am doing wrong, and what it is that you are asking me to do?" Appx. 53. In response, later that same day, McCamant sent Plaintiff an e-mail in which he stated, "I have told Dr. Coers what you told me: 1. You didn't consider what you said in class was "extreme". 2. You were aware of some recent court rulings upholding your rights to state your religious declarations in class. 3. You intended to continue this practice. Dr. Coers told me that he would discuss this with the Regent's lawyer and get back in touch with me." Appx. 54.

    2.11    On or about September 8, 2006, Plaintiff sent McCamant an e-mail in which he stated:

Dear Charles,

It has been over a week since I last asked for a written clarification of what I am doing wrong in the classroom (regarding my free speech), and what it is that ASU is asking me to do. You said that you passed it back to Dr. Coers, who then passed it back to the regent's attorney. I would still like that clarification, so I am just asking for a follow-up on this. I do not want to be accused of wrong-doing in the interim.

If I am truly doing something wrong, then I am eager to change my behavior to cooperate with the university (and at the same time, preserve my first amendment rights.) On the other hand, if this is merely a misunderstanding, I wish to clear that up as well.

---

anything basically that came out of the academic area." Appx. 5. In essence, "[t]he last line of authority before the president." *Id*.

[3] The substance of Rule 4.71 may be located at Appx. 60.

Appx. 55, 163; *see also* Appx. 11, 131.  In response, on or about September 13, 2006, McCamant sent Plaintiff an e-mail in which he stated:

> Jim:  Dr. Coers called me on Tuesday and said there won't be any written clarification coming on this issue.  The Regent's Rules Chapter V, under 4.71 that I gave you earlier suffices.  In the view of the TSUS attorney, you are in violation of that rule.  I will report to Dr. Coers that I have informed you of this.

Appx. 56, 164; *see also* Appx. 11, 131, 1051.  McCamant reported it to Provost Coers.  Appx. 11, 132.

2.12    Once again, Plaintiff was never provided with any clarification, and no attempt was ever made to give the requested clarification.  Appx. 56, 164; *see also* Appx. 11, 131, 1051.  Plaintiff was just redirected to the policy itself, as it was Defendant's position that the clarification was the instruction for Plaintiff just to re-read the Rule 4.71.  Appx. 12-14, 131.  Defendant made sure not to interpret it for Plaintiff, and there is nothing in writing that ASU has or publishes that would clarify or add to the substance of Rule 4.71.  Appx. 15.  Also, no attempt was made to reach an amicable and/or reasonable resolution to the conflict or to provide Plaintiff with any explanation that would lead to a reasonable accommodation of his religious beliefs and practices.  Appx. 1051.  In fact, Plaintiff was not provided with any reasonable accommodation.  Appx. 1051.  Additionally, Plaintiff never baited McCamant; Plaintiff was genuinely and naively believed that there had to be a way for the university and him to make a fair and lawful accommodation.  *Id.*  At the time, there is nothing that Plaintiff wanted more than to keep his job and to have a successful career at ASU.  *Id.*  Plaintiff did not aggressively challenged McCamant; most of Plaintiff's communications on the matter were in response to encounters with McCamant.  Appx. 1053-1054.  Plaintiff did fear that adverse actions would be taken against him even though he believed strongly that he was not doing anything wrong.  *Id.*

2.13    On or about October 24, 2006, June Smith, a fellow faculty member at ASU and the senior faculty member of the Christian Faculty Fellowship ("Smith"), sent McCamant an e-mail in which she attempted to reach out on behalf of Plaintiff to see if the perceived misunderstanding could be worked out.  Appx. 57, 1051.  In response, McCamant stated that he would not meet with her, and he informed Plaintiff of this.  *Id.*  On or about October 25, 2006, in an oral conversation where McCamant

informed Plaintiff about his refusal to meet with Smith, Plaintiff again requested additional clarification from McCamant regarding his alleged violations of the State System's Rules and Regulations regarding his religious comments.  Appx. 1051.  Plaintiff informed McCamant that Rule 4.71 under Chapter V of the State System's Rules and Regulations, if taken strictly, would eliminate his constitutional rights.  *Id*. Subsequently, on or about October 30, 2006, McCamant informed Provost Coers that he informed Plaintiff that he would not meet with Smith, that Plaintiff then "reiterated his stance," and that he pointed Plaintiff back to Rule 4.71 and "if someone ever complains about his statements we had notified him of the rules regarding his actions."  Appx. 59, 1051.  Again, Plaintiff never received any written or verbal clarification of the university policy.  Appx. 1051.

2.14   Plaintiff was dropping the religious speech matter in October 2006, as recommended by McCamant, when McCamant told Plaintiff that he was making a "mountain out of a molehill."  Appx. 1054.  However, McCamant brought the issue to light again in the annual evaluation of Plaintiff in November 2006, again when the Dean of Student Affairs was trying to get the student who filed the informal complaint against Plaintiff in August 2006 to file a formal complaint in January 2007, and again when McCamant revised the annual evaluation about March 2007.  *Id*.

**D.**      **November 10, 2006 Evaluation**

2.15   On or about November 10, 2006, McCamant conducted Plaintiff's annual faculty evaluation, and it was signed on or about November 14, 2006.  Appx. 63-78, 169-186; *see also* 135, 1051.  In the evaluation, McCamant noted that the class in which Plaintiff received the lowest scores on his IDEA student evaluations "has always been a difficult course and it is difficult to get positive student ratings."  Appx. 64.  McCamant also makes positive comments about Plaintiff's leadership and service for the past academic year.  Appx. 66.  However, in the "Other Comments" section of the evaluation, McCamant stated that "I have informed Dr. Jones that i[t] is a violation of the Regents Rules and Regulations regarding some comments that he has made in his classes."  *Id*.; *see also* Appx. 135-136, 1051-1052.  According to Provost Coers, the reason why the comment is noted is because "[a]s a matter

9

of record, that -- it's just something about his performance that needed to be changed, that he needed to avoid in the future." Appx. 21.  On or about November 14, 2006, comments Plaintiff wrote in this evaluation indicated that confusion existed regarding his alleged violations of university policy; however, no clarification was made in response to these comments.  Appx. 1052.

2.16    On or about November 15, 2006, Thomas Bankston, the then Interim Dean of the College of Business ("Bankston"), sent Provost Coers a memorandum in which he stated that he agreed with McCamant's recommendation for the reappointment of Plaintiff.  Appx. 61; *see also* Appx. 21, 1052.  In his memorandum, Bankston praised Plaintiff for his accomplishments, involvement with students outside the classroom, and work in the area of campus service.  Appx. 61.  Bankston goes on to note that while Plaintiff received low scores on his student evaluations in CS 2301, Plaintiff's "overall teaching effectiveness as measured by student evaluations is satisfactory," and Provost Coers agreed. Appx. 62; *see also* Appx. 21, 23.  Plaintiff received the highest mark on his evaluation that ASU gives, which is satisfactory.  Appx. 23.  However, Bankston further comments that "Dr. McCamant advised him that certain comments reportedly made in class were in appropriate and must be avoided in the future."  Appx. 62; *see also* Appx. 1052.  Attached to Bankston's November 15th memorandum were copies of the IDEA Student Evaluations for Plaintiff for his classes in the fall 2005 and spring 2006 semesters (2005-2006 academic year) and November 10, 2006 evaluation.  Appx. 61-78.

2.17    Plaintiff did not take "umbrage" with or go on a "tirade" because of McCamant's comment in his annual evaluation in November 2006 that his speech was in violation of university policy.  Appx. 1052.  In fact, Plaintiff was polite during his discussions with McCamant, and he was never rude.  Appx. 141. While it is a serious issue to formally document that an employee is in violation of official policy, Plaintiff and McCamant had not yet reached an understanding of what the problem was and what the solution should be.  *Id*.  Plaintiff said as much when he wrote in the comment section of that evaluation that "I think that there is a basic misunderstanding about what I have said, and how the university regulation applies to it."  *Id*.  Prior to that statement, Plaintiff wrote "I appreciate Dr.

10

McCamant exercising diligence and grace in this matter," and such words are not representative of a "tirade." *Id.* Further, McCamant advised Plaintiff in October of 2006 that he should "lay low" and not make an issue of this, and Plaintiff followed his advice, but to no avail because Plaintiff was completely surprised to see this issue surface in his annual evaluation. *Id.* When Plaintiff questioned McCamant about the contradiction of advising him to "lay low" and that nothing would come of this and the comment about his religious speech appearing in his evaluation, McCamant informed him was instructed to do so by Provost Coers. *Id.*

E.      **Provost Coers' Involvement**

2.18    Provost Coers was aware that an issue had arisen during Plaintiff's employment with ASU regarding Plaintiff's "classroom speech, what he discussed in -- in class." *Id.* at 7.  In fact, beginning as early as 2006 until the time that Provost Coers left ASU in 2010, he was aware of Plaintiff's classroom speech, and in the time period "when we were discussing Dr. Jones' terminal contract, there were several -- and several issues involved there," including Plaintiff's religious comments, which were reported to Provost Coers by McCamant.  Appx. 7, 25, 51, 700-701.  By "we," Provost Coers meant himself, McCamant, and Roden.  *Id.*  Provost Coers and these other men had continuing conversations about this topic "from sometime in the spring semester on into the summer," which included the time "[a]fter Dr. McCamant's second stint as department head."  Appx. 7, 261, 264. McCamant's "second stint as department head" was during the 2006-2007 academic year, which ended after the summer of 2007 when Roden was transitioning in as the new department head of the Computer Science Department.  Appx. 131.  It turns out that Roden "did not want [Plaintiff]."  Appx. 43.

2.19    Because "the issue of the religion was such a sensitive one," Provost Coers made the decision to confer with Defendant's legal counsel, on multiple occasions regarding Plaintiff's religious speech, for guidance and to include McCamant in the conversations.  Appx. 8, 15.  Provost Coers believed that "anything having to do with religion or the discussion of it is sensitive[, a]nd especially in a setting of -- in an academic setting."  *Id.*  Moreover, Provost Coers stated, "When the question of

religion came up, it wasn't minor," and his "antennae" went up.  Appx. 38.  Plaintiff's religious speech was one item of concern for Provost Coers.  Appx. 8, 15.  Plaintiff's speech concerned brief comments that Plaintiff made to his class at the beginning of the semester, during the introductory lecture, as to why Plaintiff's religion "was important in his life."  *Id*. at 9.  Although a student may have complained informally about the speech, Provost Coers never spoke with the student about the issue, and ASU would not have fired Plaintiff for the complaint.  *Id*. at 9, 17.

2.20    Provost Coers' information came solely from McCamant.  *Id*. at 9.  Provost Coers never made an effort to debrief Plaintiff on what he and McCamant had been advised as to Plaintiff's ability to continue to make brief religious comments.  Appx. 9-10.  Also, Provost Coers never spoke to or met with Plaintiff to get his side of what was being stated in Plaintiff's classes, even though Provost Coers has testified that if Plaintiff simply stated that he was a Christian because it may impair the students' view of how Plaintiff is teaching the course, then Plaintiff probably did not violate the policy.  Appx. 9, 18-19.  Additionally, the few parting words expressed by Plaintiff to his class on the last day probably did not violate policy either.  Appx. 19.  McCamant ultimately informed Plaintiff that he could not continue his religious speech in class, and he conveyed Plaintiff's reaction to Provost Coers: that Plaintiff "believed his rights were being violated."  Appx. 9-10.

2.21    Despite McCamant's comment in the November 2006 evaluation regarding Plaintiff's religious speech, Provost Coers did not investigate the issue further as "[he] assumed that it was a reference to things that he had said in class," i.e. "[d]eclarations concerning his religious beliefs" and "expressions concerning his religious beliefs."  *Id*. at 21-22.  Interestingly, the student complaint that purportedly gave rise to discussions with Plaintiff about religious comments is not even specified by McCamant in the November 2006 evaluation.  Appx. 63-66.  Plaintiff, however, did make note in the November 2006 evaluation "that no charge was filed by any student, I have not abused the trust placed in me to instruct my subject, there has been not statement given me of any specific violation, and no grievance process has been filed."  Appx. 63.  Once again, Plaintiff went on to state that "I think that

there is a basic misunderstanding about what I have said, and how the university regulation applies to it." *Id*. It upset Provost Coers and McCamant that Plaintiff "still didn't get it" because Plaintiff had "to stop making the comments." Appx. 22-23.

2.22    On or about January 19, 2007, a memorandum was drafted and placed in Plaintiff's personnel file. Appx. 98; *see also* Appx. 44. The memorandum references a "Bible thing" and the "Interim Department Head," which would have been McCamant at that time. Appx. 98. As for the "Interim Department Head," the memorandum memorialized that McCamant, "Don't like the fact that he quoted out of Bible & then say someday walk through life & happy, some day's life brick wall." *Id*. It goes on to state that McCamant "will write letter to him." *Id*. From approximately August 2006 until January 2007, McCamant led Plaintiff to believe that several students had complained about his religious comments, and in or around January 2007, McCamant informed Plaintiff that I was "walking on very thin ice." Appx. 1053.[4]

**F.      Plaintiff Applies for Department Head Position**

2.23    On or about January 31, 2007, Plaintiff applied for the then vacant position of Head of the Computer Science Department. Appx. 667-678, 1052. Plaintiff was well-qualified for the vacant position. Appx. 667-678, 902, 1052. Specifically, Plaintiff held the requisite educational degrees, which included an M.B.A. in Information Systems from North Texas State University and a Ph.D. in Computer Science from New Mexico State University. *Id*. In addition to his personal education, Plaintiff had more than ten years experience teaching at the university level in full-time, tenure track positions at other universities. *Id*. Also, in 2005 when Plaintiff was first hired, ASU asked him if he would be interested in becoming the head of the department, and further, ASU led him to believe that the position was his if he so desired. Appx. 1052.

---

[4] ASU's administration did attempt to force Plaintiff to stop making his religious comments, and McCamant repeatedly told Plaintiff that he was "walking on thin ice" and that he was taking a huge risk. Appx. 1054. Plaintiff and McCamant had conflict over this issue for most of the academic year, and ASU continually attempted to stop Plaintiff's comments, but he refused to comply, stating that their actions were illegal, asking for clarification, asking for the opportunity to clear up the matter, and asking for accommodation. *Id*.

2.24     Despite the foregoing, Plaintiff was denied any meaningful consideration for the position when he applied in January 2007.  Appx. 146, 450, 679, 901, 1052.  Although Doug Fox served on the selection committee and testified that the subject of religion did not come up in the search committee meetings, this is not surprising at all.  Appx. 1052.  As the most influential person on the committee (by virtue of being head of the department, chair of the search committee, and the greatest seniority in the department), McCamant could easily steer the committee in the direction he wanted it to go.  Appx. 143, 146, 156, 624, 635, 899, 901, 1052.  McCamant indicated to the committee that he did not want to even interview Plaintiff.  Appx. 901.  Further, the non-computer science faculty members of the committee (which includes Fox) would have been "outsiders" to some extent and would have given great deference to the opinions and desires of the two computer science faculty members on the committee (McCamant and Lehmann).  Appx. 146, 898, 1052.

2.25     The individual ultimately selected for the vacant position of Head of the Computer Science Department, Tim Roden ("Roden"), was younger than Plaintiff and possessed significantly less experience and qualifications compared to Plaintiff.  Appx. 144, 632, 681-685, 991, 1053.  Plaintiff was 51 at the time that he applied for the position.  Appx. 1053.  Roden did not even meet the minimal requirements necessary for consideration of the vacant position.  Appx. 142, 144-145, 154-155, 158, 276-277, 281, 315, 327, 349, 619, 665-666, 681-685, 1053.  The position announcement iterated that the candidate should have "credentials commensurate with those of an associate or full professor, and significant and effective experience in teaching on the university level which would qualify for appointment at a senior faculty rank are necessary."  Appx. 155; *see also* 665-666, 1053.  Provost Coers has previously stated that in order for a person from outside the university to be hired as at the rank of associate professor, that person must have at least 4 years full-time experience at the associate professor level.  Appx. 158, 315, 1054.

2.26     At the time of his application, Roden had only 1.5 years of experience as an assistant professor.  Appx. 276, 1053.  Further, even if he had the required 4 years minimum experience, 4 years

does not qualify as "significant . . . experience . . . on the university level," nor would 4 years "qualify for appointment at a senior faculty rank." *Id*.   However, Roden was shown favorable treatment, as requirements were waived or disregarded.  Appx. 142, 144-145, 154-155, 158, 276-277, 281, 315, 327, 349, 619, 631, 665-666, 681-685, 901, 1053.   Despite the foregoing, Angelo State University still awarded Roden the position of Head of the Computer Science Department instead of Plaintiff, which demonstrates that Plaintiff's age and/or religious speech were a motivating factor in ASU not giving Plaintiff any meaningful consideration for the position for the position of Head of the Computer Science Department. *Id*.

2.27   If someone is on tenure track at ASU, "you go on probation and that lasts typically for six years and your tenured at the end of the sixth year or not tenured at the end of the sixth year." Appx. 25, 220.   Plaintiff was given a six year probationary period; however, Roden was shown favorable treatment again (despite his lesser qualifications than Plaintiff), as he was only given a four year probationary period.  Appx. 633-635, 663, 687, 940.  If you are not tenured at the end of your sixth year, [y]ou're usually given a year of grace to find another job;" in other words, "you're typically given the year of grace, the seventh year, and that's it." *Id*.   Also, being nonrenewed prior to the end of the six year probationary period is serious, "injurious to a professor's career," and would be "negative" to other prospective employers in the field of education "[i]f it becomes known."  Appx. 29-30.

**G.      Plaintiff Treated Less Favorably**

2.28   In addition to the denial of consideration for the position of Head of the Computer Science Department and the tenure probationary period difference, Plaintiff was treated differently than other faculty members in the Computer Science Department with regard to raises, tenure selections, summer teaching assignments, and other special and/or reasonable accommodations.  Appx. 1053.  For example, in or around the fall 2007, Motl was granted an increase in salary that was twice the percentage of salary increase granted to Plaintiff, despite not having significantly better performance as compared to Plaintiff.  Appx. 1053.  In or around fall 2007, computer science faculty member Beth

Niehues ("Niehues") was hired and promised the opportunity to obtain her Ph.D. while teaching, and upon completion of her Ph.D., her position would be converted into a tenure-track position. *Id.* In or around the fall 2007, computer science faculty member Mark Crouch ("Crouch") was granted tenure and promotion, despite lacking the requisite qualifications. Appx. 904-905, 939, 1053. Also, Roden was given special arrangements for his computer labs. Appx. 703, 862.

2.29    On or about April 4, 2008, Roden sent a request to other faculty members requesting one volunteer to volunteer for Blackboard training; however, Roden did not include Plaintiff in this request despite the fact that Plaintiff had the most experience using Blackboard. Appx. 1053. In April 2008, Plaintiff was not allowed to apply for an internal grant, even though he had a compelling case for being awarded the grant, but moreover, no other faculty members were prohibited from applying for grants. Appx. 284, 401-403, 1053. Also, from approximately August 2006 through August 2007, Plaintiff was not notified of a single departmental meeting, which involved issues including but not limited to curriculum changes, software changes, scheduling, and staffing. Appx. 1050. On or about August 30, 2006, McCamant refused to discuss with Plaintiff the possible reconsideration of a departmental software change, which was decided without any input from Plaintiff, as a faculty member in the Computer Science Department, and without warning. Appx. 703, 860-861, 1051. This software change caused Plaintiff to lose two class days. *Id.*

**H.    McCamant Revised the November 10, 2006 Evaluation**

2.30    Eventually, a second version of the November 10, 2006 evaluation was created by McCamant. *Compare* Appx. 79-82, *with* Appx. 83-85; *see also* Appx. 24, 142, 1054. This second version was created in or around March 2007. Appx. 79; *see also* Appx. 27, 1054. The difference between the original version and the second version is that additions have been made to the critique of Plaintiff's teaching performance. *Compare* Appx. 79-82, *with* Appx. 83-85; *see also* Appx. 24. In the original version, the teaching critique simply stated that "[t]he student evaluations of Dr. Jones are satisfactory," which is the highest mark one may receive for evaluations at ASU. Appx. 81, 84. In the

second version, the teaching critique stated that "[t]here of the five courses for Dr. Jones are very good to excellent," but "[f]or the other two, we have discussed and implemented some changes." Appx. 80. The second version of the November 2006 evaluation once again documented the dispute surrounding Plaintiff's religious practices; however, again as before, no clarification was provided relating to the confusion surrounding Plaintiff's alleged violations of university policy. Appx. 79-82, 1054. Instead, McCamant again warned Plaintiff that his religious comments in class were inappropriate. Appx. 1054.

**I.      Plaintiff is Reappointed, then Non-Reappointed**

2.31    On or about May 24, 2007, Dr. James Hindman, the then President of ASU ("Hindman"), sent Plaintiff a letter informing Plaintiff of his reappointment for the 2007-2008 academic year. Appx. 87, 841; *see also* Appx. 25, 1054. The letter goes on to note that the reappointment "is made in accordance with and subject to the provisions" of ASU's policies, rules, and regulations. Appx. 87. Plaintiff signed the letter of reappointment on June 4, 2007. *Id.* The appointment did not contain any conditions. Appx. 136. On or about August 9, 2007, McCamant continued his efforts to build a paper trial by sending Plaintiff an e-mail in which he reprimanded Plaintiff for turning in two students' grades three (3) hours late. Appx. 1054. However, this measure of lateness is not truly late by university practice, and further, Plaintiff had been in contact with the registrar's office and the dean's office throughout the day keeping them informed of the status of these grades. *Id.*

2.32    In or around June 2007, Roden started his employment at ASU, and he worked with McCamant for three summer months to help Roden transition into the new position of department head. Appx. 1054.[5]  Roden eventually took over as Head of the Computer Science Department in or around

---

[5] The claim that Roden did not ever mention Plaintiff's religious comments is untrue because when Roden assumed the department chair position (either on or before September 1, 2007), Plaintiff spoke with Roden and asked if there was any way he could get his job back. Appx. 1054. Roden replied "no" and went on to say that he too was a Christian and offered a platitude that when God closes a door, he opens a window. *Id.* Since Plaintiff and Roden were talking about getting Plaintiff's job back and not about religion, Plaintiff was quite surprised that Roden brought up religion because it was completely out of context with the conversation, and this suggests that he was aware of Plaintiff's religious statements and that they formed the basis for Plaintiff's non-reappointment. Appx. 1054-1055. In other conversations with him, Roden informed Plaintiff that McCamant fully apprised him of Plaintiff's situation and that he was in full agreement with McCamant's decisions. Appx. 1055. In deposition, Roden affirmed that McCamant had made him fully aware of all the events and the nature of Plaintiff's non-reappointment. *Id.*

the end of August 2007.  *Id*.  The computer science department was transferred from the College of Business to the College of Science either at the beginning of the fall 2007 semester (which would have been approximately the last week of August 2007), or on September 1, 2007 (which is when the university became part of the Texas Tech System).  *Id*.

2.33    After the May 24th letter of reappointment, on or about August 14, 2007, McCamant sent Plaintiff a memorandum in which he informed Plaintiff that the 2007-2008 academic year would be his terminal year.  Appx. 85A; *see also* Appx. 25-26, 1054.  On or about August 24, 2007, McCamant notified Plaintiff that he was not being reappointed as a result of "the things we have been talking about," of which the only topic discussed on numerous occasions regarded Plaintiff's religious statements.  Appx. 1054.

2.34    Then, on or about August 30, 2007, Dr. Joseph Rallo, the new incoming President of ASU ("President Rallo"), sent Plaintiff a letter stating that he would not be renewed after the 2007-2008 academic year.  Appx. 86; *see also* Appx. 30, 209 (noting that Provost Coers, McCamant, and Roden were the "team" behind the decision).  President Rallo did not review Plaintiff's personnel file at this time, and he relied on what Provost Coers told him to do.  Appx. 208-209 215,.  However, as Provost Coers testified, nothing happened between May 24, 2007 and August 14, 2007 that warranted the non-reappointment:

> Q.    Okay.  So what happened between May 24th of '07 and the issuance of the letter of appointment and August 24th of '07?
>
> A.    The determination was made that that year would be his terminal year.
>
> Q.    Did he do something bad or wrong or -- after May 24th, '07 but before August 14th, '07?
>
> A.    No.

Appx. 26.

2.35    Additionally, when questioned about what happened from the time of the November 10,

2006 evaluation to the August 14, 2007 letter of non-reappointment, Provost Coers testified that it was

based on the discussions that he had with McCamant and Roden during the 2006-2007 academic year:[6]

Q.  Did he do something bad or wrong after November 15th of '06 and before August 14th of '07?

A.  I -- I think there were -- there were things that happened during that time period that may indeed have led to the decision not to renew -- not -- for this to be his terminal year.

Q.  Well, do you know or you say there may have been?

A.  Well, yes, there were and these are specified by -- this was part of the discussion that took place after the May letter and -- and this letter.

. . . .

Q.  And if you -- well, why didn't you all -- if -- if something bad had happened or he'd performed unsatisfactorily on May -- by May 24th, '07, why didn't you all issue a letter saying he was not going to be renewed?

A.  Because I don't know that we knew by that point for certain.  The discussions about his status continued on through the summer.

Q.  Involving whom?

A.  Involving Dr. McCamant and the dean -- Dr. Roden, actually by this time.  Dr. Roden was in that position by this time.

. . . .

Q.  What happened?

A.  What happened was we had continuing conversations between Dr. Roden and me, counsel and the dean about his status, about whether he was to be --

. . . .

Q.  All right.

A.  So these were ongoing discussions that led to the decision not to -- not to renew the contract after the '07/'08 year.

Q.  All right.  These ongoing discussions -- did they happen before or after the May 24th, '07 letter of appointment?

A.  They happened both before and after.

---

[6] Appx. 7, 25, 51.

Appx. 26-27.

And, once again, in the time period "when we were discussing Dr. Jones' terminal contract, there were several -- and several issues involved there," including Plaintiff's religious comments, which were reported to Provost Coers by McCamant.  Appx. 7, 25, 51.  Once again, by "we," Provost Coers meant himself, McCamant, and Roden.  *Id*.

2.36    In or around September 2007, Plaintiff approached Dr. Grady Blount, Dean of the College of Sciences at ASU ("Dean Blount"), about reversing the decision of non-reappointment letter.  Appx. 1055.  At first, Dean Blount tried to assist Plaintiff by seeking to have the decision reversed, but after speaking with Provost Coers and reviewing Plaintiff's file, Dean Blount abruptly changed his mind.  Appx. 564, 576-577, 1055.  When Plaintiff asked what information in his file Dean Blount based this new position, Dean Blount advised Plaintiff that this decision was based upon comments in Plaintiff's file regarding his religious statements.  *Id*.  On or about September 12, 2007, Dean Blount received a letter of support for Plaintiff from the ASU Faculty Senate.  Appx. 590.  On or about October 25, 2007, President Rallo sent out an e-mail to the ASU community about a previous e-mail regarding religious materials.  Appx. 714.

**J.        President Rallo Reviews the First Non-Reappointment Letter**

2.37    In or around November 2007, Plaintiff approached President Rallo and requested that he reconsider the non-reappointment letter.  Appx. 1057.  Plaintiff informed President Rallo that it was his belief that the non-reappointment letter was based on discriminatory and/or unlawful reasons, and pursuant to President Rallo's request, Plaintiff provided him with a packet of materials demonstrating Plaintiff's teaching, research, and service, which are the sole criteria for faculty evaluation.  *Id*.  While waiting for President Rallo's final decision, in or around December 2007, Plaintiff requested, received, and reviewed his personnel file.  *Id*.  Upon Plaintiff's review of his personnel file, he learned that all the comments and warnings made by McCamant were based solely upon a single informal complaint that was filed on or about August 14, 2006.  *Id*.  During the entire time that Plaintiff was at ASU, he was

never made aware of any other student complaints, whether formal or informal, about his brief religious comments that he made in his classes.  Appx. 1057.

2.38     On or about December 3, 2007, at the end of the fall 2007 semester, President Rallo sent Plaintiff a letter in which he stated, "I am continuing to gather data on your November 21, 2007 request that I reevaluate my August 30, 2007 decision which issued a non-reappointment letter to you."  Appx. 96.  President Rallo goes on to state, "My initial review of the material I have received to date has raised concerns about how the process by which documentation to support the issuance of the letter was conducted."  *Id*.  President Rallo stated, "I have asked for additional documentation from various offices so that my review decision may be based on the presence or absence of essential information."  *Id*.

2.39     On or about January 28, 2008, President Rallo sent Plaintiff a letter in which he stated that the August 2007 non-reappointment letter was being overturned because:

> My review found no evidence in your personnel file to support the issuance of a non-reappointment letter.  All information in the file, including the May 24, 2007 letter from then President Hindman, supports your continued status as a tenure track member of the Department of Computer Science.[7] . . . [I]t is within my authority as President to rescind the August 30 non reappointment letter and to reinstate you to your former status as a tenure track member of the College in the Department of Computer Science.  It is therefore my decision to reinstate you effective August 30, 2007, to your status as a tenure track member of the Department of Computer science.  Any information to the contrary will be permanently removed from your personnel file.  I wish you well in your career and extend my apology for the uncertainty created. . . .

Appx. 88; *see also* Appx. 35, 202, 208, 214-215, 218, 223, 1057.  It was then that a "final decision" had been made regarding Plaintiff's non-reappointment because President Rallo "make[s] the ultimate decision at ASU."  Appx. 35, 88, 202, 1057.[8]  Provost Coers was copied on this letter.  Appx. 88.

2.40     Subsequent to the August 2007 non-reappointment letter, Motl served on a

---

[7] President Rallo confirmed that he reviewed everything up until that point, and it supported renewal.  Appx. 210, 214, 216.

[8] Much later, Plaintiff learned that President Rallo did not make a substantive review of his personnel file or of the substantive decision to terminate his employment; rather, President Rallo merely checked the file to see if all the paperwork was in the file, irrespective of the contents of the paperwork.  Appx. 219, 1057.  Because President Rallo did not think there was all the necessary paperwork in the file, he reversed McCamant's recommendation of non-reappointment.  *Id*.

committee that was formed to find a replacement for Plaintiff.   Appx. 850, 859.   McCamant assembled the search committee.  Appx. 850.  To some within the Computer Science Department, President Rallo's decision was not viewed as a "reversal" because they "thought it had just been placed on hold."  Appx. 943.  In fact, McCamant conveyed this message to the Computer Science Department during a departmental meeting.  *Id*.  Therefore, the general understanding was that the "non-reappointment was being placed on hold."  *Id*.  Eventually, the hold was removed and the non-reappointment continued to proceed as the search committee "finally got approval."  *Id*.

**K.      Roden Continues Harassment**

2.41     At a department meeting on or about January 28, 2008, the computer science department class schedule for the fall 2008 was disseminated.  Appx. 1057.  At this time, it was believed by all that Plaintiff's status was "non-reappointed," since the reversal of that decision was made later that day, and news of such was not circulated until days later.   Appx. 1057-1058.  At this meeting, the schedule showed that Plaintiff's undetermined replacement would teach two (2) sections of a low level computer literacy course and two (2) sections of a programming course.  *Id*.  However, upon subsequent news of Plaintiff's reappointment, Roden changed the schedule at least by February 5, 2008, allowing Plaintiff only to teach the low level computer literacy courses for fall 2008, which was unusual and punitive. Appx. 693, 861-862, 1057-1058.  Usually there is a discussion with the professor before a change is made, but that did not happen.  Appx. 693.  Furthermore, this same action was taken again by Roden for the spring 2009 schedule.  Appx. 1057-1058.

2.42     On or about February 4, 2008, Plaintiff was denied the opportunity to teach summer courses, although his rank at ASU was higher than others in the department afforded this opportunity, and even though one faculty member would have let Plaintiff have his assignment.  Appx. 281-282, 1058.  Then, on or about February 7, 2008, only eight business days following President Rallo's final decision, Roden sent Plaintiff a memorandum in which he stated that effective the spring 2008 semester, all of Plaintiff's classes would be evaluated with the IDEA student evaluations, each and every

semester, which was a departure from the way Plaintiff's had been evaluated. Appx. 94; *see also* Appx. 266, 718, 792, 823-824, 1058. The policy was more rigorous. Appx. 573. This memorandum only shows Plaintiff as a recipient, and it states, "I am sending you this memorandum since this <u>new</u> policy applies to you." Appx. 94 (emphasis added). Professors who only have one section of each of their courses evaluated can choose their most favorable sections for evaluation. Appx. 1058. Thus, this option was taken away from Plaintiff. *Id*. Also, Roden implemented this policy change to build a record on Plaintiff. Appx. 267.

**L.    Roden Changes Evaluation Policy & February 2008 Evaluation**

2.43    In or around February 6, 2008, Roden sent an email to the faculty requesting data for faculty evaluations. Appx. 1058. Plaintiff was headed out of town at this time and responded to this request by notifying Roden that he could not provide him with this information until his return on or about February 13, 2008. *Id*. One week after the evaluation policy change, on or about February 14, 2008, Roden completed a faculty evaluation for Plaintiff, dated February 15, 2008, which was negative and not signed by Plaintiff. Appx. 91-93, 1058. This was the first and only negative evaluation that Plaintiff ever received at ASU. Appx. 40, 45, 138. As with the November 2006 evaluation, there are two versions of this evaluation. Appx. 366-368.

2.44    Although Roden checked the unsatisfactory box for Plaintiff's "Leadership/Service" on Page 1 of the evaluation, the Leadership/Service comment box on Page 3 of the evaluation does not state anything negative, and in fact, it is full of examples of Plaintiff's extensive leadership and service. Appx. 91, 93. Also, Roden checked the unsatisfactory box for Plaintiff's "Teaching" on Page 1 of the evaluation; however, the Teaching comment box on Page 2 of the evaluation does not state anything negative. Appx. 91-92. Roden never sat in one of Plaintiff's classes, he just spied on him through the classroom window, which is contrary to policy or practice. Appx. 278, 831.

2.45    The only comments that seem to support Roden's unsatisfactory selections are located in the "Other Comments" portion of the evaluation. Appx. 93. In that section, Roden criticizes Plaintiff's

teaching based solely and exclusively on the IDEA student evaluations, which are only supposed to be 30%-50% (now even less) of the consideration in evaluating one's teaching performance.  Appx. 93, 719.  Also, in that section, Roden makes a fuss over Plaintiff not taking a programming team to a competition in the fall 2007 semester, which was not even mandatory.  *Id*.  Roden does state in that same section that "[s]ince Jim had been given a non-reappointment letter I decided not to press the issue with him;" therefore, it was no longer an issue (even though Defendant is now trying to use it as a reason for the non-reappointment).  *Id*.

2.46    It turns out that Roden based his entire evaluation of Plaintiff's teaching performance on the IDEA student evaluations from the fall 2007 semester, which was contrary to the policy that the entire <u>academic</u> year (fall and spring, not the calendar year) should be analyzed.  Appx. 41-43, 45, 266, 268, 703, 854-855.  However, only one out of four classes (CS 1361, MWF 9:00) had low scores, and the other evaluations for that semester were in the "satisfactory range."  *Id*.; *see also* Appx. 99-110.  Also, Roden and Provost Coers decided to use the IDEA student evaluations as a "major portion of the evaluation" even though the IDEA student evaluations are only supposed to be 30%-50% (now even less, 25%-33%) of the consideration in evaluating one's teaching performance because no such much weight should be given to such evaluations.  Appx. 41, 703, 719.

2.47    It is important to note that while the IDEA student evaluations from Plaintiff's spring 2008 semester classes were not considered by Roden, those evaluations, as determined by Provost Coers, were "a lot better" and "higher numbers. . . . [s]ome much higher."  Appx. 42, 266; *see also* Appx. 111-126.  Plaintiff actually taught three sections of CS 1361 in the spring 2008 semester, which was the class that had the "low" scores in the fall 2007 semester.  *Compare* Appx. 99-110, *with* Appx. 111-126; *see also* Appx. 42.  But, these improved student evaluations were not even considered.  Appx. 45.[9]  Also, on or about February 14, 2008, Plaintiff was denied the opportunity to provide a written

_____

[9] Although the reasons given in Roden's faculty review were poor student evaluations and lack of departmental leadership and cooperation, the reasons stated for the recommendation for non-reappointment were not based on new

response to Roden's negative performance evaluation, which should have been considered at all stages of his performance evaluation. Appx. 1058. This denial is contrary to ASU's policies or practices. Appx. 831. In subsequent conversations, Roden informed Plaintiff that he "didn't want him to succeed." Appx. 274.

**M.   Dean Blount's Involvement & Second Non-Reappointment Recommendation**

2.48   On or about February 22, 2008, in response to Plaintiff's recent faculty evaluation, Plaintiff wrote a memo to Roden and Dean Blount.[10] Appx. 270, 291-295, 1059. In this memo, Plaintiff pointed out his skills and qualifications as an educator, and he questioned the validity of the reasoning behind the recommendation for non-reappointment. Appx. 270, 291-295, 1058-1059. Plaintiff believed that the reasons for McCamant's recommendation of non-reappointment (i.e., his religious comments) played at least some part in this recommendation. Appx. 270, 291-295, 1059. Specifically, Plaintiff referenced the events of fall 2006 and the decision the previous year for non-reappointment, and he informed them that it was his belief that these issues had been laid to rest; however, that in light of the second recommendation for non-reappointment, he no longer believed those issues had been settled. Appx. 295; *see also* Appx. 270, 1059.

2.49   On or about March 3, 2008, Dean Blount denied consideration of the error in processing Plaintiff's performance evaluation. *Id*. On or about March 7, 2008, Dean Blount sent a memorandum to Provost Coers, entitled "Update on James Jones tenure-track faculty recommendation." Appx. 90. In his memorandum, Dean Blount stated that "I am confident that Dr. Roden and I can work with him on an aggressive professional development program with a well-documented paper trail to support a terminal appointment in 2009," that "a terminal appointment for AY08-09, if it were going to be issued, would have to be done prior to the end of the spring semester," and that human resources "agreed to

---

[10] Although McCamant might have no longer been Plaintiff's supervisor, McCamant continued working in the same department as him and had continuous interaction and contact with Roden, as well as Provost Coers.

events, and as such, Roden's reasoning hid the actual basis for his recommendation, which Plaintiff's religious beliefs and comments. Appx. 1058.

review extant documentation in Jones' . . . personnel file and get back to us with a recommendation on how to proceed." *Id.*

2.50    Dean Blount also stated in his memorandum that "Jones did not receive adequate oversight and goal-setting during his first two years" and that "Jones' behavior in the 07-08 academic year [which includes the fall 2007 semester] may have been influenced for the pressure of being under a terminal contract." Appx. 90. Additionally, Dean Blount stated that in his conversations with Plaintiff, "he appeared to be genuinely contrite," not uncooperative or defiant. *Id.*; *see also* Appx. 44. At this point, Dean Blount "was asking that [Provost Coers and Roden] continue Dr. Jones one more year before . . . a terminal contract." Appx. 44. On that same day, March 7, 2008, Plaintiff sent Dean Blount an e-mail discussing the discrimination and stating that he wanted to rebuild bridges. Appx. 592-594.

2.51    After receiving this memorandum, Provost Coers "talked to Grady," and Dean Blount changed his mind. *Id.* Because Dean Blount was "new," Provost Coers filled him in on the history with Plaintiff, which included the problems with Plaintiff's religious comments:

> Q.    Are you telling the jury on this video tape that Grady Price Blount didn't know what he was doing?
>
> A.    I'm saying that he was very new to the job, very idealistic. He didn't know the history of this, and I had not had a chance to talk to him about it.
>
> Q.    What history?
>
> A.    The fact that there had been problems raised with Dr. Jones before that may have not come out on a satisfactory/unsatisfactory, but were percolating before the fall of the year that led to his terminal contract.
>
> Q.    You talked to Dr. Blount about those, didn't you?
>
> A.    I talked to Dr. Blount about the fact that there was a history that he may not have been aware of.
>
> . . . .
>
> Q.    He wanted not to give him a terminal contract; isn't that true?
>
> A.     I -- I suppose it is, but he was feeling me out about whether I would be receptive to that.
>
> Q.    And you weren't , were you?

A.      I was not.

Appx. 45-46; *see also* Appx. 566.  When Dean Blount inquired about Plaintiff's situation, Provost Coers stated, "you don't want to know," because it involved issues before the fall 2007 semester.  Appx. 564.

2.52     On or about March 26, 2008, contrary to discussions with Plaintiff regarding the future of his faculty position and after his discussion with Provost Coers, Dean Blount sent a memorandum to Provost Coers, this time entitled "Non-reappointment for Dr. James Jones."  Appx. 95; *see also* 1059. In his memorandum, Dean Blount recommended the non-reappointment of Plaintiff.  *Id*.  This despite the fact that, just nineteen days earlier, Dean Blount was asking that Plaintiff be given one more year. Appx. 44, 90.  Also, this was despite the fact that President Rallo stated in his January 28, 2008 letter that "[m]y review found no evidence in your personnel file to support the issuance of a non-reappointment letter," which would have included Plaintiff's performance in the fall 2007 semester. Appx. 88.  Provost Coers signed this memorandum on or about April 8, 2008.  Appx. 95.  Plaintiff was not a recipient of Dean Blount's memorandum.  *Id*.

2.53     Other faculty members were recommended for reappointment, despite receiving student evaluations not so different from Plaintiff, and having less departmental and university-wide experience, as well as less service to the profession when compared to him, as well as no scholarly production compared to his excellent scholarship.  Appx. 1059.  Thereafter, in or around April 2008, Roden denied Plaintiff the opportunity to apply for a university research grant and placed a letter in his box making accusations of insubordination, thus, continuing the manipulative efforts to build a paper trail.  *Id*.

**N.      Second Non-Reappointment Letter & President Rallo's Review**

2.54     On or about June 13, 2008, following a stellar semester of student evaluations, President Rallo issued a letter to Plaintiff stating that the 2008-2009 academic year would be his last and that he would not be reappointed.  Appx. 97.  On or about June 21, 2008, Plaintiff sent Provost Coers a letter, entitled "non-reappointment," in which he stated that the second non-reappointment was unjust in light of President Rallo's January 2008 decision and that the letter served to trigger any available recourse

and processes and "to preserve any and all rights of appeal, procedure, etc." Appx. 230. On or about July 10, 2008, Plaintiff met with President Rallo, and as he had done previously, he requested President Rallo to review the letter of non-reappointment and render a final decision regarding his employment, as it was Plaintiff's belief that the reason for his non-reappointment was, once again, based on and a continuation of the original discriminatory and/or unlawful reasons involving McCamant, Roden and Provost Coers (i.e., Plaintiff's religious comments). Appx. 1060.

2.55    On or about July 13, 2008, Plaintiff sent President Rallo certain materials for review, which had been requested by President Rallo. Appx. 359-404, 1060. President Rallo advised Plaintiff that he would review the non-reappointment to see if it was once again flawed; Rallo previously overturned the previous letter of non-reappointment based upon his finding that the process was flawed. Appx. 1060. Moreover, President Rallo informed Plaintiff that if the letter of non-reappointment was not warranted, he had "no problem" in overturning it again. *Id.* President Rallo also informed Plaintiff that he did not like "fishy circumstances," which were exactly the type of circumstances that Plaintiff was alleging. *Id.* Although President Rallo states that the only incident involving religious discrimination that Plaintiff informed him of was an event that occurred in 2006, when Plaintiff met with him in 2008, Plaintiff informed President Rallo that he believed that he was still being discriminated against for his religious speech. *Id.*

2.56    While Plaintiff was waiting to receive a final decision from President Rallo, on or about October 27, 2008, Plaintiff was evaluated again, and Roden recommended that Plaintiff not be reappointed for the following year.[11] Appx. 279, 330-335, 855, 1060. Roden signed the October 2008 evaluation and recommendation on or about October 30, 2008. Appx. 330, 1060. Roden expressed that his reasons for this recommendation for Plaintiff's non-reappointment remained the same as the reasons

---

[11] Such a recommendation was nonsensical if the June 2008 letter of non-reappointment was final. Appx. 1060. This was a "fail-safe" strategy in the event that President Rallo's final decision would be that Plaintiff again not be non-reappointed. *Id.* If President Rallo's final decision was for Plaintiff to continue his employment and if this new recommendation from October 2008 was ultimately accepted, then 2009-2010 academic year would have been his last year of employment with ASU. *Id.*

for the previous recommendation in February 2008.  Appx. 330-335, 1060.  This recommendation was made despite Plaintiff's remarkably improved performance since the February 2008 recommendation, and despite the fact that Plaintiff did exactly what Roden requested him to do.  Appx. 333, 1060.

2.57     The three main areas on which a faculty member is evaluated are service, research, and teaching.  Appx. 39.  Despite the fact that Plaintiff only received one "unsatisfactory" mark out of three categories (and all three categories are weighted the same) on this evaluation, his overall grade was "unsatisfactory," and at this point, Plaintiff teaching was not "unsatisfactory."  Appx. 280, 330, 334, 858-859.  On or about November 11, 2008, Provost Coers sent a memorandum to Dean Blount in which he expressed that "I concur with the recommendation of the department and I recommend the following person for non-reappointment."  Appx. 591, 1060.  The only person listed on the memorandum was Plaintiff, who was listed as an Associate Professor of Computer Science.  *Id.*

2.58     On or about December 10, 2008, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was prohibited from reappointment for constitutionally impermissible reasons, as ASU treated me in a discriminatory manner based upon his religion and age.  Appx. 551-555, 1060.  Plaintiff received his "right to sue" letter from the EEOC on or about April 26, 2009 or possibly later.  Appx. 463-465.  Additionally, Plaintiff received a "right to sue" letter from the Texas Workforce Commission Civil Rights Division on or about June 12, 2009.  *Id.*

2.59     On or about December 15, 2008, Plaintiff sent President Rallo an e-mail inquiring as to whether he had finished his review and made a final decision as to whether or not Plaintiff would be non-reappointed.  Appx. 1061.  On or about December 16, 2008, President Rallo responded by sending Plaintiff an e-mail in which he informed Plaintiff that he had spent several months over the fall 2008 semester seeking recommendations on the decision to non-reappoint me and that "[n]either a clear consensus emerged and no alternative solution was forthcoming."  *Id.*  As such, President Rallo

29

informed Plaintiff that the final decision was to non-reappointment,[12] in contrast to the final decision

regarding the previous non-reappointment recommendation, which was reversed.  *Id.*  Therefore,

Plaintiff's last day of employment was approximately May 16, 2009.[13]

### III.
### SUMMARY JUDGMENT EVIDENCE

3.1      Pursuant to Local Rules 7.1(i) and 56.6, Plaintiff relies upon the summary judgment

evidence set forth in and attached to Plaintiff's Appendix to Plaintiff's Response to Defendant's Rule 56

and 12(c) Motions for Summary Judgment and/or Judgment on the Pleadings, which is hereby

referenced and fully incorporated herein by this specific reference and is hereby referenced in Plaintiff's

Response to Defendant's Rule 56 and 12(c) Motions for Summary Judgment and/or Judgment on the

Pleadings and fully incorporated therein by this specific reference.

### IV.
### ARGUMENT AND AUTHORITIES

**A.      Standards of Review**

**1.      Rule 12(c) Motion**

4.1      Rule 12(c) of the Federal Rules of Civil Procedure states that "[a]fter the pleadings are

closed . . . a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  "A motion brought

pursuant to Fed.R.Civ.P. 12(c) is designed to dispose of cases where the material facts are not in dispute

and a judgment on the merits can be rendered by looking to the substance of the pleadings and any

judicially noticed facts."  *Hebert Abstract Co. v. Touchstone Properties, Ltd.*, 914 F.2d 74, 76 (5th Cir.

1990).  "The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to

---

[12] Again, President Rallo made no substantive review or determination concerning Plaintiff's performance or of the recommendation to terminate his employment; rather, as he had done before, President Rallo merely checked to see if all the paperwork was in the file and, as a result, he effectively delegated the substantive decision.  Appx. 219, 1060.  Of course, by this time, Defendant learned from its previous mistake and created a sufficient paper trail.

[13] On or about July 22, 2009, Defendant verified that Plaintiff's term of employment was from September 1, 2005 until May 16, 2009.  Appx. 1060.

dismiss." *Guidry v. Am. Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).[14]

4.2     "Pleadings should be construed liberally,"[15] and the Court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff."[16]  "The determining issue is not whether the plaintiff will ultimately prevail on the merits, but whether he is entitled to offer evidence to support his claim." *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004).  Moreover, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[17]

## 2.     Rule 56 Motion

4.3     The granting of summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  *See* FED. R. CIV. P. 56(c); *see also Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008) ("Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.'").  The trial court must resolve all reasonable doubts in favor of the party opposing the motion.[18]  The party seeking summary judgment carries the burden of demonstrating the

---

[14] *Cf. Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004) ("A motion to dismiss under Rule 12(b)(6) is 'viewed with disfavor and is rarely granted.'") (quoting *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)).

[15] *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001).

[16] *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232, 244 (5th Cir. 2009) (reiterating that the court "must accept as true the well-pleaded factual allegations in the complaint during the pleadings stage" and "must also draw all reasonable inferences in the plaintiff's favor"); *cf. Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.").

[17] "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

[18] *See Casey Ent. Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981); *see also Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008) ("We review all evidence in the light most favorable to the nonmoving party.").

absence of a genuine issue concerning any material fact in the case.[19]   Once the moving party has satisfied its burden, the non-movant must "set forth specific facts showing that there is a genuine issue for trial."   *See* FED. R. CIV. P. 56(e).   Moreover, "[s]ummary judgment is usually considered an inappropriate tool for resolving employment discrimination cases because the claims involve 'nebulous questions of motivation and intent.'"   *See Thornbrough v. Columbus & Greenville R.R.Co.*, 760 F.2d 633, 640 (5th Cir. 1985).[20]

**B.      Plaintiff's pleadings articulate viable claims under the Texas Constitution.**

      **1.      Plaintiff named a proper party and stated a proper claim.**

      4.4      Defendant is misguided when it cites the *Heinrich* decision for the proposition that Plaintiff failed to name a proper party.   In essence, Defendant is trying to resurrect an immunity defense after having effectively waived it.   In *Heinrich*, the Court's ruling on the proper party issue turned on the question of governmental immunity.   *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372-373 (Tex. 2009) (reasoning that "it follows that these suits cannot be brought against the state, <u>which retains immunity</u>, but must be brought against the state actors in their official capacity") (emphasis added).   In the instant case, Defendant waived its immunity when it removed the case to federal court.   *See Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 624 (2002) (holding that a State waives its Eleventh Amendment immunity when it removes a case from state court to federal court).   *See also Myers v. Texas*, 410 F.3d 236, 242 (5th Cir. 2005).   Here, Defendant voluntarily removed this case from state court to federal court and, in so doing, waived its immunity.   Further, on or about October 14, 2009, Judge Sparks heard motions from all parties regarding remand and transfer of this

---

[19] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Nat'l Union*, 532 F.3d at 401 ("The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case.").

[20] "Often, motivation and intent can only be proved through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the fact-finder.   In reviewing a case on appeal, it is difficult to determine what evidence might legitimately sway the fact-finder and hence be material.   Thus, if any facts are in dispute, summary judgment is generally inappropriate."   *Thornbrough*, 760 F.2d at 641.

action.  At that hearing, Defendant announced in open court that it would not attempt to assert the immunity defense that it raised in the initial federal court suit.  Accordingly, Defendant cannot now rely on its immunity—the very heart of the *Heinrich* decision—to block Plaintiff's suit against it.  Plaintiff has sued the proper party.  Accordingly, Defendant's motion on this ground should be denied.

**2.      Plaintiff has not sued for monetary relief under the Texas Constitution, and he only seeks equitable relief, which is permitted.**

4.5      Defendant erroneously presumes that the only relief Plaintiff seeks in this lawsuit is monetary.  To the contrary, Plaintiff seeks injunctive relief against Defendant.  The United States Supreme Court has long recognized the right to seek injunctive relief and prospective relief against the state.  *See Ex parte Young*, 209 U.S. 123, 155-156 (1908); *Edelman v. Jordan*, 415 U.S. 651, 664 (1974); *Brennan v. Stewart*, 834 F.2d 1248, 1252 (5th Cir. 1988).  Additionally, claims for fees associated with prospective relief and fees that may be awarded as costs are not barred by the Eleventh Amendment.  *See Hutto v. Finley*, 437 U.S. 678, 692 (1978).  Because Plaintiff seeks relief which may be granted, his cause of action should not be dismissed under Rule 12(c).

**C.      ASU is not entitled to summary judgment.**

**1.      Plaintiff's Title VII claims are not barred by limitations.**

4.6      "In a suit on a right created by federal law, filing a complaint suffices to satisfy the statute of limitations."  *See Henderson v. United States*, 517 U.S. 654, 657 n. 2 (1996).  Here, the statute tolled when Plaintiff originally filed suit, on July 10, 2009, less than 90 days after receiving his right-to-sue letter.  While the first suit was pending and the statute was tolled, Plaintiff then filed the second suit in state court, on August 11, 2009.  Because the statute was tolled and the clock was not still "ticking" at the time Plaintiff filed his second suit, limitations will not bar the instant suit.

4.7      Moreover, the discriminatory actions were a continuous sequence of actions that culminated with the non-reappointment letters in August 2007 and June 2008, the evaluations in February and October 2008, and the president's final decision to not overturn the non-reappointment in December 2008.  Hence, those acts are within the required deadlines.  The continuing violation theory

permits plaintiffs to bring claims showing that there has been "a pattern or policy of discrimination continuing from outside the limitations period into the . . . limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered timely." *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001). A plaintiff relying on this doctrine must show more than a series of discrete discriminatory acts. Rather, the plaintiff "must show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *See id*. at 352 (quoting *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998)).

4.8    Moreover, the Fifth Circuit identified three factors that may be considered in determining the existence of a continuing violation:

> (1) whether the alleged acts evidence the same type of discrimination;
> (2) whether the alleged acts are recurring or are more in the nature of isolated work assignments or incidents; and
> (3) whether the alleged acts have the degree of permanence that should trigger an employee's awareness of and duty to assert his or her rights.

*See id*. "'In addition, the continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period' such that a valid connection exists between them." *See id*. As demonstrated herein, the acts against Jones were such a continuing violation.

## 2.    Plaintiff's EEOC/TWC charge does not invalidate his discrimination and retaliation claims.

4.9    Defendant erroneously argues that Plaintiff may not recover for discriminatory actions occurring before June 13, 2008. However, Defendant fails to consider fact that the Defendant's actions constituted a continuing tort and that all discriminatory acts committed as part of this pattern or policy are considered timely. *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001). These were not discrete acts to be considered separately or severed from each other. Rather, all of the discriminatory acts committed as part of this pattern or policy are timely. *See supra*, Section II.

## 3.    The statutory notice requirement does not bar Plaintiff's claims under Chapter 110 of the Texas Civil Practice and Remedies Code.

4.10     Defendant seems to argue that Section 110.006's notice requirement is jurisdictional. However, case law does not support that position.  In *Barr v. City of Sinton*, the Texas Supreme Court reviewed a religious discrimination case brought under Chapter 110 of the Texas Civil Practice and Remedies Code.  *See Barr v. City of Sinton*, 295 S.W.3d 287 (Tex. 2009).  In that case, the plaintiffs failed to give notice under Section 110.006.  *See id.* at 293, n.8.  Despite the fact that the trial court found that the plaintiffs failed to give notice, the Texas Supreme Court ruled in favor of the plaintiffs and remanded the case for determination of injunctive relief, actual damages and attorney fees.  *See id.* at 293, 308.  Similarly, the notice requirement should not bar Plaintiff's claims in the present case.

4.11     Further, Defendant erroneously assumes that Chapter 110's notice requirement requires that the letter cite specifically to Chapter 110 of the Texas Civil Practice and Remedies Code or follow a specific form.  The heart of this requirement is putting the employer on notice of the discrimination so it may take action to correct it.  *See* TEX. CIV. PRAC. & REM. CODE § 110.006(a).  In the present case, Plaintiff repeatedly notified ASU, in writing and in person, of the circumstances of the on-going discrimination, but Defendant ignored it.  Appx. 270-271, 291-295.  His correspondence clearly included the required information, namely that (1) his free exercise of religion was substantially burdened by an exercise of the government agency's authority, (2) the particular act that was burdened, and (3) the manner in which the exercise of governmental authority burdened the act.  *See id.*  The only departure from the statute's requirement and the manner in which Jones gave notice at or near the time of the discrimination was that Jones gave notice via email and hand delivery, rather than certified mail.  *See id.*  Presumably, the requirement of a certified letter is tied to the ability to document and confirm the receipt of the notice.  Because Plaintiff submitted the initial notice via email, ASU gave similar confirmation of receipt and was the functional equivalent of a certified letter.  Accordingly, Plaintiff gave adequate, timely notice to ASU of his claim, and his cause of action should not be dismissed for failing to transmit the notice via certified mail.

4.12     When did ASU impose upon Plaintiff's right to freedom of religion?  That was not fully

realized until President Rallo informed Plaintiff on December 16, 2008 that the final decision was to non-reappointment him, in contrast to the final decision regarding the previous non-reappointment recommendation and/or decision, which was reversed.

### 4. The evidence demonstrates a valid contract and a breach thereof.

4.13    ASU has an academic freedom policy, and "[w]ithin the faculty handbook there are a series of policies related to classroom expression freedom." Appx. 212, 217, 421. According to President Rallo, ASU does not caution or tell its professors that they "can't tell [their] class ever in any way what [their] own religion is," and moreover, it is does not violate ASU's policies and is perfectly fine for a professor to tell his classes that "in case you think it may effect, through biases or otherwise, I'm a Muslim, or that sort of thing." *Id*. "And of course if a Muslim can do it, a Christian can do it." *Id*. Also, it does not violate ASU's policies for a professor to tell his class at the end of the semester, "go with Allah, go with God, best wishes, have a good life." Appx 212-213. Same thing if it is a Christian making such declarations. *Id*. at 213.

4.14    At the time of the issuance of the second letter of non-reappointment, ASU was no longer governed by the State System's Rules and Regulations; instead, it was governed by the Texas Tech University System ("Texas Tech System") and the Texas Tech System's Rules and Regulations. Appx. 1061. Those rules and regulations constituted additional terms of Plaintiff's employment. Appx. 203-204, 420-421, 545, 841, 1061. Furthermore, Texas Tech System's Rules and Regulations 04.02.08 provides a procedure for addressing allegations made by non-reappointed faculty members who allege that the non-reappointment decision was made for constitutionally impermissible reasons. Appx. 547-550, 1061. Texas Tech System's Rules and Regulations set out that upon such an allegation of non-reappointment based on constitutionally impermissible reasons, a faculty committee will consider the allegation, and if probable cause for such an allegation exists, then a hearing panel is to be conducted in accordance with a detailed set of procedural rules. *Id*.

4.15    Plaintiff specifically alleged discrimination, based upon his religious beliefs and practices with respect to the second non-reappointment, as well as age discrimination because he was denied any meaningful consideration for the vacant position of Head of the Computer Science Department; however, a faculty committee was never convened to consider such allegations, as delineated in Texas Tech System's Rules and Regulations.  Appx. 204, 291-295, 1061.  According to President Rallo, "Dr. Jones is entitled to absolute due process."  Appx. 203; *see also* Appx. 817, 819.

4.16    According to President Rallo's testimony, because Plaintiff was on tenure-track, he had more rights then someone who was not on tenure-track, and he had an expectation to be renewed if he had a good evaluation.  Appx. 207, 431-432.  In other words, Plaintiff had "a little more objectively based expectancy, depending on getting a decent evaluation."  *Id*.  Also, according to ASU's policies, if Plaintiff "got a satisfactory evaluation, . . . he could objectively and reasonably expect to be renewed."  *Id*.  Because of Defendant's conduct and breach of its own policies, Plaintiff has suffered injury and damage.  Appx.465-474.

4.17    Also, according to Defendant's own policies, the evaluations are supposed to be used to help a professor improve his performance, but in this case, Defendant did not follow that policy.  Appx. 271-272.  The only example given by defendant is ordering Plaintiff to take a programming team to an out of town competition after he already been given a letter of non-reappointment.  *Id*.

### 5.    Plaintiff presents a prima facie case of discrimination and hostile work environment.

4.18    Defendant only states part of the framework for evaluating employment discrimination claims.  The plaintiff must first present a prima facie case of discrimination, namely that (1) plaintiff was a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) non-protected class employees were not treated similarly.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  When plaintiff establishes the prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the unequal treatment.  *See id*.  If the employer offers such a reason, then the burden shifts

back to the plaintiff to show either (1) the employer's stated reason was not true but was only a pretext for discrimination, or (2) the employer's stated reason, while true, is only one of the reasons for the conduct and another "motivating factor" is the plaintiff's protected characteristic. *See Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004). Here, the evidence clearly demonstrates that Plaintiff's religious expression was a motivating factor in the adverse actions against him.

> **6.      There is adequate evidence of causation for Jones' discrimination and retaliation claims.**

4.19    The Texas Supreme Court made clear that correct standard of causation in employment discrimination cases is whether the discrimination was a "motivating factor" for the employment practice. *See Quantum Chemical Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001). For a plaintiff to prevail, the discrimination need not be the only motivating factor; rather, other legitimate factors may also have motivated the practice. *See id*. As demonstrated herein, there is ample evidence that Defendant's discrimination of Jones was a motivating factor for the adverse actions taken against him.

4.20    Further, Defendant appears to argue erroneously that Plaintiff must prove that Defendant had intent to discriminate against him. While the evidence adequately demonstrates Defendant's intent, such evidence is not central to a claim of discrimination by way of disparate impact. Proof of discriminatory motive is critical to a disparate treatment claim; however, no proof of discriminatory motive is necessary to a disparate impact claim. Rather, under the disparate impact theory, a facially neutral employment practice may be deemed illegally discriminatory without evidence of an employer's subjective intent to discriminate. *See Raytheon Co. v. Hernandez*, 540 U.S. 33 (2003).

4.21    With respect to the pretextual reason offered by Defendant about Plaintiff purportedly "refusing" to take a programming team to a competition, this argument is completely distorted by Defendant. On or about September 17, 2007, Roden demanded that Plaintiff take a programming team to an out-of-town competition in November 2007, despite his status of being "non-reappointed." Appx. 1056. In regards to Roden receiving a dose of Plaintiff's hard-headed attitude and that Plaintiff openly, adamantly, and defiantly refused Roden's decision to escort a programming team are false. *Id*. To

begin with, Plaintiff politely responded to the demand that he was unavailable because Plaintiff had just received a letter of non-reappointment, and he needed every opportunity to find a job; Roden was intentionally hindering that opportunity.  Appx. 435-436, 1056.  Roden purposefully and vindictively asked Plaintiff to give up a weekend to go on an out of town trip during the height of the recruiting season with application deadlines expiring.  *Id.*   Roden wrote back stating "in that case, we need to talk about it."  Appx. 296, 1056.

4.22     Roden had already been very confrontational with Plaintiff since the time he assumed the position of department head in or around August 2007, so Plaintiff did not relish the thought of another unpleasant encounter.  Appx. 1056.  Over the next few days, there were two times that Roden was walking down the hallway, following just very few feet behind Plaintiff.  *Id.*  At those times, he did not address Plaintiff, nor did he remind Plaintiff that he wanted to talk to Plaintiff about the programming competition.  *Id.*  Therefore, Plaintiff assumed that he had second thoughts about the unreasonableness of his position and that he had changed his mind, no longer demanding that Plaintiff take the team out of town.  *Id.*  Plaintiff was quite surprised when exactly one week after his first email on this matter, he sent an email to Dean Blount on September 24, 2007 stating that Plaintiff "refused" to take the team and that he was placing this e-mail in Plaintiff's personnel file.  Appx. 296, 1056.

4.23     Such requests are served voluntarily, which was confirmed by Motl in his deposition testimony.   Appx. 861, 869-870, 1056.   Motl admitted in his deposition that even under normal circumstances, requiring a faculty member to go out of town was unreasonable and that he himself would not do this.  *Id.*[21]  This is further evidenced by an email McCamant sent to Plaintiff on or about October 17, 2006, in which McCamant asked Plaintiff if he could take students on a trip and stated that if he could not, it was ok.  *Id.*  Moreover, Roden mentioned this 2007 incident in Plaintiff's February

---

[21] The fact that this is especially unreasonable to ask of a non-reappointed faculty member is implied by Roden's email on June 30, 2008, just two weeks after news of President Rallo's issuance of the second non-reappointment.  Appx. 1056.  Plaintiff had received the second letter of non-reappointment and the programming competition was just months away; however, this time, Roden informed Plaintiff that he and Motl would take care of the competition and that Plaintiff did not have to do anything.  *Id.*

2008 evaluation but stated that "[s]ince Jim had been given a non-reappointment letter I decided not to press the issue with him;" therefore, it was no longer an issue (so it is curious that Defendant is now trying to use it as a reason to justify the non-reappointment).  Appx. 296, 1056.  Also, the same thing happened after the second letter of non-reappointment, but Roden acted much differently.  Roden again demanded that Plaintiff take a programming team to competition in November 2008; however, Roden recanted this demand following the second letter of non-reappointment.  Appx. 298, 1058.

4.24   In regards to "going over McCamant's head," McCamant was not yet the department head during the summer of 2006 (McCamant replaced Motl as the department head for the 2006-2007 academic year), so that claim is false.  Appx. 1055.  Motl was still the current department head in the summer of 2006.  *Id*.  Plaintiff asked Motl about the trip, and he informed Plaintiff that he could not authorize it since the trip would actually take place in the next academic year, when he would no longer be the department head.  *Id*.  Plaintiff knew that McCamant would be the incoming interim head, so Plaintiff asked for his permission.  *Id*.  McCamant stated that since he was not yet the department head, he could not make that decision at the current time.  *Id*.

4.25   Given the impasse (nobody was saying "no," they were saying they were not in a position to make the decision), Plaintiff asked Butler (then current dean and the supervisor of the department head) what he should do.  *Id*.  Butler recommended that Plaintiff talk with the vice-provost, Dr. Beck.  Appx. 1055.  Dr. Beck then resolved the situation, reminding everyone that in the past, there had been cases where approval had been made in one year for travel in the upcoming year.  *Id*.  Further, there was no such "department protocol" as alleged and such protocol (even informal) had never been communicated to Plaintiff.  *Id*.[22]  Even though such a discussion is on McCamant's meeting notes for August 28, 2006, he did not make it past the religious speech issue.  *Id*.

---

[22] As an example of how Plaintiff earnestly tried to be compliant, cooperative, and communicative, in an email, dated October 17, 2006, Plaintiff asked McCamant if he could speak with Bankston (then interim dean) about a trip for the following semester.  Appx. 1055.  There is a similar request with similar demonstration of cooperation in an email almost a year later, dated July 6, 2007, where Plaintiff asked McCamant if he could ask Dean Blount about travel funding.  *Id*.

4.26    It is also a mischaracterization to state that Plaintiff made a "mountainous" issue of travel in fall 2007 and that he went over someone's head to make a scholarly presentation. Appx. 1055. First, there are factual errors: the emails initially referred to in this portion of Defendant's "statement of facts" took place over the summer of 2006, not during the fall of 2007, and the travel took place in October 2006. *Id*. A complicating factor is that Plaintiff was seeking approval in one academic year (2005-2006) for a trip that would happen in the next academic year (2006-2007). *Id*. Other complicating factors were that there were going to be changes of leadership at both the department head level and at the dean level. *Id*. Plaintiff had a letter of commitment from Butler, the then current dean over his department, which Plaintiff received around the time when he was hired that memorialized that ASU would fund two trips per year for Plaintiff. Appx. 884, 1055. The request Plaintiff was making was for the first such trip of that academic year. Appx. 1055.

4.27    The issue of buying out teaching time is misrepresented by Defendant. Appx. 1061. Plaintiff was involved in serious discussions with high ranking intelligence officials about doing funded research, and he needed to find out what the rules were, if there were any; however, he was again in a situation where both the department head position and the dean position would be changing in just a few months, causing ambiguity and indecisiveness. Appx. 1061-1062. Not only did the current department head and the current dean not have experience with funded research, but also, anything that the current department head or that the current dean would have said could have been trumped by the incoming department head and dean. Appx. 1062. The only reasonable thing to do was to talk with the provost, to see if funded research was indeed something that the university was interested in pursuing. *Id*. McCamant did in fact conditionally agree to allow Plaintiff to buy out time, and it was not "a breach of protocol or policy" and did not cause disruption. Appx. 137, 1062.

4.28    Buying out teaching time is a very common practice: incoming research money is used to pay a portion of the faculty member's salary in order to free up that portion of the faculty member's time for research. *Id*. Universities love this because it is very beneficial to the university, both

financially and in terms of bolstering the university's reputation. *Id*. Although McCamant sharply criticized Plaintiff's attempt to inquire about buying out teaching time, weeks later, he apologized for the letter. *Id*. McCamant admitted to Plaintiff that perhaps he had over-reacted, but unfortunately, this apology did not find its way into written form, nor did it manifest itself in the removal of a scathing letter from McCamant from Plaintiff's personnel file. *Id*.

4.29    The issue of Plaintiff using Lehmann's lab sheets is totally misrepresented. Appx. 1062-1063. The lab sheets were not plagiarized, they did not have copyright symbols, and Plaintiff did not claim them as his own work. Appx. 1062. Lehmann gave Plaintiff these labs, and she proudly proclaimed that "we help each other out here." *Id*. However, Lehmann did not give Plaintiff any specific direction as to what to do or what not to do with them. *Id*. When Plaintiff used the lab sheets, he put a clear notation at the bottom: "Lab designed by Dr. Mark Motl and Dr. Twila Lehmann." *Id*. When Plaintiff received a complaint from Lehmann, he immediately worked to comply with her request. Appx. 1062-1063. Lehmann never even filed a complaint about this purported "big" issue. Appx. 620.

4.30    The claims about Plaintiff's interactions with the department are also mischaracterized.[23] Appx. 1063-1064. Prior to the first non-reappointment letter in August 2007, Plaintiff ate with the department many times on Fridays,[24] until other ASU commitments precluded the frequency and Plaintiff received the first letter of non-reappointment. Appx. 866, 1063. Most often, Middleton did not attend these departmental lunches, and several times, Crouch did not attend these lunches either. *Id*. There are also many other instances of Plaintiff's interactions and attempts to interact with the department, such as asking others in the department to eat with his family, join his family for a game or movie, help with research projects, talk with them about common interests and their children, join him for lunch at the Baptist Student Ministries, join him at the Christian Faculty Fellowship. Appx. 788,

---

[23] Also, Doug Fox did not have any personal encounters with Plaintiff, and he has no direct knowledge of Plaintiff's performance or collegiality, as he was not a faculty member within the Computer Science Department. Appx. 1064.

[24] The statement that lunches were on Wednesdays is incorrect; the department ate together on Fridays. Appx. 1063. Plaintiff also attended Lehmann's retirement lunch. *Id*.

1063-1064.   Plaintiff also conferred with his colleagues about work and giving assistance to them; Plaintiff's wife even brought food to the department.   Appx. 1064.   It is hard to be friendly when someone is trying to fire you; however, Plaintiff's actions and attitude were always appropriate.   *Id.*

4.31   Defendant claims that Plaintiff received a "number of below average student evaluations" in fall 2007 and cites only one class in Defendant's Appendix to prove this point; however, it is the wrong class.  Appx. 1064.  Plaintiff taught four courses that semester, and only one of those four classes gave him low scores (having a score of 3.0 on a 5.0 scale).[25]   *Id.*   One out of four classes is not a "number of below average student evaluations."   *Id.*   The other three class evaluations had scores of 4.1, 4.1, and 4.2, and even on the lowest evaluation (the 3.0), approximately 7% of the university scored lower, but those 7% were not similarly non-reappointed.   *Id.*   By the time all of Plaintiff's evaluations for all courses are considered, the overall percentage of the university scoring lower than Plaintiff exceeds 30%.   *Id.*

4.32   The one low score in fall 2007 is mitigated by the fact that the very same semester, Plaintiff taught the same course with much different and better results, and this demonstrates the highly subjective nature of the student evaluations:  they are more of a popularity contest than a true measure of teaching effectiveness.   *Id.*  ASU does not state that it wants popular teachers, but rather, it wants good teachers.  Appx. 1064.  This one low score is also mitigated by the fact that in several other semesters, Plaintiff taught this same course with better success.  Appx. 727-728, 742-769, 1064.  Plaintiff's history of teaching this one course has the following scores:  3.4 and 4.1 in fall 2005; 3.8 in fall 2006; 4.4 and 4.7 in spring 2007; 3.0 and 4.1 in fall 2007; and 4.2, 4.7, and 4.9 in spring 2008.  Appx. 729-730, 738-781, 1064-1065.

4.33   The 3.4 was deemed acceptable by the fact that Motl judged that semester as "satisfactory" and recommended Plaintiff for reappointment as a "valuable member of the CS department" in his February 3, 2006 annual evaluation.  Appx. 1065.  This opinion was shared by Butler

---

[25] In filling out the evaluations, the students are misled by believing that a 3 is akin to "average," but the university views it much more harshly. Appx. 1064.

in his February 10, 2006 annual evaluation. *Id*. The 3.8 was deemed acceptable by the fact that McCamant judged Plaintiff's teaching satisfactory when he revised the November 2006 annual evaluation in March 2007. *Id*. Both of these scores were deemed acceptable by the fact that President Rallo iterated that there was no evidence in Plaintiff's file that warranted non-reappointment when he overturned the first non-reappointment recommendation. *Id*.

4.34    Overall, considering all of Plaintiff's courses, at most only three courses out of twenty could be construed as receiving low scores, and these three courses include the one course above. Appx. 1065. The other two low scores were not any worse than the one above and are similarly mitigated by higher scores in other semesters. *Id*. Even McCamant himself received "poor student evaluations" when he taught at ASU. Appx. 130. McCamant testified that it was not unusual for faculty "to get some semesters with very low student evaluation." And that it is "not unusual" for student evaluations to very from semester to semester or from section to section. *Id*. The organization that created and administers the IDEA student evaluations recommends that student evaluations constitute no more that 30% to 50% of the assessment of teaching. Appx. 719, 1065. In deposition, Sarah Logan, the local administrator of the IDEA student evaluations, articulated that the figure had been downgraded to 25% to 33%. *Id*. However, Defendant is using these evaluations for 100% of the assessment of teaching. *Id*. Further, the student evaluation organization recommends that a long horizon be given to assessing these evaluations, and it recommends a minimum of 8 classes. Appx. 723, 1065. Accordingly, the history of Plaintiff's teaching well meets the standard of acceptance. Appx 853, 885-887, 1065-1068.

4.35    It is a distortion of the facts as they relate to ASU's actions that "at the beginning of Jones' second year at ASU, Jones' practice [of identifying himself as a Christian] ruffled some student's feathers." Appx. 1057. Once again, the only "complaint" from any student was an unofficial complaint that was lodged in August 2006. Appx. 152, 1057. That complaint was not an earnest complaint about religious speech, but rather, a desperate attempt by the student to get a refund. Appx. 129, 152, 1057. The use of the word "some" greatly overstates the matter. Appx. 1057. It is also false that "relatively

few formal complaints were filed" because there were in fact no formal complaints filed. *Id.*

4.36    In the single case known of by Plaintiff and based on the deposition testimony of ASU's employees, the only thing that comes close to a formal complaint was when ASU encouraged a student to file a formal complaint (the same student who complained informally in August 2006); however, the student chose not to do so. *Id.* It is a complete distortion of the facts to state that several students complained informally, and that they complained to several faculty members outside of computer science. *Id.* Defendant has identified only one faculty member (Toni Sauncy) who asserts that students complained to her. *Id.* Under deposition, she identified only two students who complained to her, and further, this revelation from Sauncy came well after Plaintiff's departure from the university (at the eleventh hour, just a week before discovery closed in this case). *Id.*

4.37    The two purported student complaints conjured by Defendant at the last minute can easily and logically be explained. Appx. 1068-1070. More importantly, it is not uncommon at ASU for students to criticize teachers, as Provost Coers himself testified.[26] Appx. 16. Roden testified that Plaintiff was not disruptive in class and that "I certainly had no student complaints, no faculty complaints." Appx. 265, 270. Defendant should be the one weary of "making a mountain out of a molehill," as Defendant tries to scrap anything together to postulate a non-discriminatory reason for non-reappointing Plaintiff. Provost Coers testified that other than the one informal complaint in 2006, ASU did not receive any other complaints about Plaintiff's religious speech. Appx. 39. Moreover, Provost Coers admitted that Plaintiff's religious comment of telling his class that he was a Christian might be to an artificial intelligence class. Appx. 16. And, Plaintiff did in fact teach artificial intelligence classes. Appx. 61.

4.38    No one ever retracted the statement told to Plaintiff that his speech violated policy. Appx. 13-14. This despite the fact that Provost Coers cannot even say whether or not Plaintiff's religious speech was "controversial" as prohibited in Rule 4.71, and McCamant cannot even give

---

[26] Provost Coers was also in charge of student and academic affairs while at ASU.

specifics as to what Plaintiff said that was "controversial," just that Plaintiff "talked about his religion." Appx. 15.[27]   In fact, when deposed in this case, McCamant stated that he was not aware of a policy at ASU that would prohibit Plaintiff from saying that he is a Christian in class or from allowing Plaintiff to extract a quotation from the Bible.  Appx. 130.  Roden testified that Plaintiff's statements did not violate policy and that even he might have said similar things to his class at the end of the semester.  Appx. 265.

4.39    Ultimately, Plaintiff's brief religious comments were at least <u>one</u> of the motivating factors as to the decision to non-reappoint Plaintiff, as well as the manner in which Plaintiff responded to and "queried" McCamant and Roden about "the religious issue," which included the mere fact that Plaintiff was asking for clarification.  Appx. 17-18, 979-980, 984, 98-988, 992-993, 1014.  This despite the fact that in deposition McCamant testified that Plaintiff is entitled to ask for clarification and that it would have been okay to state at the end of the last class of the semester, "God bless you.  Live a good life."  Appx. 131.  Also, this despite the fact that President Rallo testified that "anyone has the right to be protected by freedom of speech and freedom of religion."  Appx. 207.

## 7.    Jones' Federal Declaratory Judgment Act claim is valid.

4.40    Defendant erroneously asserts that Jones' declaratory judgment action cannot be heard without joining the Texas State University System ("System").  However, Defendant offers no statute, policy, or evidence that would require the System's participation in this action.  Essentially, Defendant's argument is not one of jurisdiction, but one of joinder.  *See Republic of the Phil. V. Pimentel*, 128 S.Ct. 2180, 2188-89 ("[Rule 19] instructs that non-joinder even of a required person does not always result in dismissal.").  To the extent that Defendant would now contend that the System is an indispensable party, the proper remedy would be for Defendant to seek joinder of the System, rather than to seek dismissal of Plaintiff's action.  In the unlikely event that the Court would agree with Defendant and be inclined to dismiss Plaintiff's declaratory judgment action, Plaintiff submits that the Court may order the System's joinder, pursuant to Federal Rule of Civil Procedure 19(a)(2), and go forward with the action.

---

[27] McCamant testified that he "did not go into his class or anything like that."  Appx. 140.

4.41    Defendant erroneously argues that Plaintiff's claims under the Declaratory Judgment Act should be dismissed.  To the contrary, Plaintiff's claim for declaratory relief provides a means of relief that is otherwise unavailable in each of his other claims: a speedy hearing of the declaratory judgment action.  *See* FED. R. CIV. P. 57.  Rule 57 provides that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.  The court may order a speedy hearing of a declaratory judgment action."  *Id.*; *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity . . . to create a new form of relief to qualifying litigants.").  The swift resolution of employment-related claims is particularly valuable, given the Jones' interest in resolving this dispute and moving forward with his career.

4.42    Further, although a court has broad discretion as to whether it will hear a declaratory judgment action, the court cannot refuse to hear the action on a whim or personal disinclination; it may do so only for good reason.  *See Public Affairs Assocs. v. Rickover*, 369 U.S. 111, 112 (1962).  In deciding whether to hear a declaratory judgment action, the court should evaluate three considerations: (1) the proper allocation of decision-making between state and federal courts; (2) fairness; and (3) efficiency.  *See Sherwin-Williams Co. v. Holmes City*, 343 F.3d 383, 390-391 (5th Cir. 2003).  The absence of any pending related state litigation weighs strongly against dismissing the suit.  *Id.* at 394.  Because this Court may fairly and efficiently determine Jones' declaratory judgment claim, and because Defendant has offered no evidence to the contrary, the claim should not be dismissed.

4.43    Finally, Defendant argues that Plaintiff cannot obtain injunctive relief for his injuries.  However, Plaintiff seeks reinstatement, which is clearly a permissible form of injunctive relief in Title VII claims.  *See Murry v. American Standard, Inc.*, 488 F.2d 529 (5th Cir. 1973).

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests the Court to deny Defendant's Rule 56 and Rule 12(c) Motions for Summary Judgment and/or Judgment on the Pleadings, in all things.

Plaintiff further requests the Court to grant him such other and further relief, both general and special, at law or in equity, to which he may show himself justly entitled.

Respectfully submitted,

_/s/ Michael Y. Kim_____

| | |
|---|---|
| Frank Hill | 09632000 |
| Michael Y. Kim | 24039960 |
| Christie L. Hobbs | 24059961 |

HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas  76013
(817) 261-2222
(817) 861-4685 Facsimile
fhill@hillgilstrap.com
mkim@hillgilstrap.com
chobbs@hillgilstrap.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2011, I electronically filed the foregoing with the clerk for the U.S. District Court, Northern District of Texas, using the CM/ECF system which will send notification of such filing to case participants registered for electronic notice, including the following counsel of record:

Daniel C. Perkins
Assistant Attorney General
Texas Attorney General's Office
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548.

_/s/ Michael Y. Kim_____
Michael Y. Kim